**NOBLE ENERGY, INC., Petitioner,**

**v.**

**CONOCOPHILLIPS COMPANY,**
Respondent

No. 15-0502

Supreme Court of Texas.

Argued January 12, 2017

Opinion delivered: June 23, 2017

Rehearing Denied December 15, 2017

Thomas C. Wright, Elizabeth H. Rivers, Raffi O. Melkonian, Wanda McKee Fowler, Wright & Close, LLP, Houston, Deborah G. Hankinson, Hankinson LLP, Dallas, Foster Calhoun Johnson, Jane Langdell Robinson, John Zavitsanos, Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing, P.C., Houston, Wanda McKee Fowler, Wright & Close, LLP, Houston, for Petitioner.

Macey Reasoner Stokes, Benjamin A. Geslison, Baker Botts L.L.P., Houston, Joshua Alexander Norris, Lara Pringle, Jones Walker LLP, Houston, Omar Jesus Alaniz, Baker Botts L.L.P., Dallas, Richard Warren Mithoff, Sherie Potts Beckman, Mithoff Law Firm, Houston, Thomas R. Phillips, Baker Botts L.L.P., Austin, for Respondent.

Leif M. Clark, Leif M. Clark Consulting PLLC, San Antonio, for Amici Curiae Chevron USA, Inc. and ExxonMobil Corporation.

Christine R. Raborn, Royston, Rayzor, Vickery & Williams, L.L.P., Houston, for Amicus Curiae Citgo Petroleum Corporation.

Joshua W. Wolfshohl, Porter Hedges LLP, Houston, for Amicus Curiae Plains All American Pipeline, L.P.

Chief Justice Hecht delivered the opinion of the Court, in which Justice Willett, Justice Boyd, Justice Devine, and Justice Brown joined.

The principal question in this case is whether, under the terms of a bankruptcy court order confirming a plan of reorganization and an agreement for sale of the debtor's assets, the purchaser was assigned an undisclosed contractual indemnity obligation of the debtor. We agree with the court of appeals[1] that the answer is yes and therefore affirm.

## I

Conoco[2] and Alma swapped oil and gas interests in 1994 under an Exchange Agreement in which each accepted responsibility and indemnified the other for any environmental claims related to the properties received, no matter who caused the injury or when, whether before the swap or after.[3] The agreement provided that the

1. 462 S.W.3d 255 (Tex. App.—Houston [14th Dist.] 2015).

2. For simplicity, we refer to respondent ConocoPhillips Co. and its predecessors as "Conoco"; petitioner Noble Energy, Inc. and its predecessors as "Noble"; Alma Energy Corp. as "Alma"; Alma and Noble's asset purchase and sale agreement as "the APA"; Alma's plan of reorganization in bankruptcy as "the Plan"; and the bankruptcy court's order confirming the Plan and the APA as "the Order". We focus on the terms of these three documents and direct the reader to the court of appeals' opinion for a thorough recitation of the facts of the case. Id. at 258–263.

3. Section VII(c) provides: "Assignee assumes full responsibility for, and agrees to release, indemnify, hold harmless and defend Assignor, its agents, officers, and employees from and against all loss, liability, claims, fines, expenses, costs (including attorney's fees and expenses) and causes of action caused by or arising out of any federal, state or local laws, rules, orders and regulations applicable to any waste material or hazardous substances on or included with the Assets or the presence, disposal, release or threatened release

mutual indemnities would "survive ... the transfer of the Assets".[4] Each party's recorded assignment effectuating the transfers was expressly "made subject to that certain Exchange Agreement dated June 14, 1994, between [Conoco] and Alma", set out the indemnity obligation,[5] and provided that it would be a "covenant[ ] running with the lands, [l]eases, and interests" assigned and would "extend to, bind and inure to the benefit of the parties ..., their heirs, successors and assigns."

In 1999, Alma filed for protection under Chapter 11 of the Bankruptcy Code.[6] Conoco was a party to the bankruptcy proceeding. After a court-approved auction in 2000, Noble and Alma entered into the APA. Noble agreed to buy "[t]he oil and gas leases, mineral interests, and other significant Assets described in Exhibit 'A' ",[7] which included the properties Alma had received from Conoco under the Exchange Agreement. Noble also agreed to buy "[a]ll [Alma's] rights and interests in and to all ... agreements ... in any way associated with the Assets, including but not limited to, those Material Contracts ... described on Exhibit 'D' ",[8] including "[a]ny agreement of ... indemnification by [Alma] outside of the ordinary course of business".[9] The Exchange Agreement, though "associated with the Assets", is not listed in either Exhibits A or D, nor was it listed in Alma's disclosures or mentioned in any way in the bankruptcy proceeding. Noble contends it had no actual knowledge

---

of all waste material or hazardous substance from the Assets into the atmosphere or into or upon land or any water course or body of water, including ground water, whether or not attributable to Assignor's activities or the activities of Assignor's officers, employees or agents, or to the activities of third parties (regardless of whether or not Assignor was or is aware of such activities and regardless of any claimed negligence in whole or in part attributable to Assignor) prior to, during or after the period of Assignor's ownership of the Assets. This indemnification and assumption shall apply to liability for voluntary environmental response actions undertaken pursuant either to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), as such may be amended from time to time, or to any other federal, state or local law."

**4.**  Exchange Agreement § XII(m).

**5.**  Conoco's assignment to Alma stated: "[Alma] has agreed and does hereby agree to indemnify and defend Assignor, Assignor's subsidiary and affiliated companies, and its or their respective agents, officers, employees, successors, and assigns, from and against all claims, demands, causes of action, or liability of any nature or kind, including (without limitation) civil fines, penalties, costs of cleanup, or plugging liabilities, brought by any and all persons, entities, or governmental agencies including (without limitation) [Alma's] or [Co-

noco's] employees, agents, or representatives and also including (without limitation) any private citizens, persons, organizations, and any agency, branch or representative of federal, state or local government, on account of any personal injury, death, damage, destruction, loss of property, or contamination of natural resources (including soil, air, surface water or ground water) resulting from or arising out of any liability caused by or connected with the presence, disposal or release of any material of any kind, including, without limitation, asbestos and/or NORM, in, under, or on the Leases at the time of this Assignment, or thereafter caused by acts of [Alma's] employees, representatives, or agents with regard to use of the Leases, wells, or equipment subsequent to this assignment, without regard to whether such liability, injury, death, damage, destruction, loss, or contamination is caused in whole or in part by any claimed negligence, active or passive, on the part of [Conoco] or other indemnified person or entity. To the extent there is any conflict between this Assignment and the Exchange Agreement, the latter Agreement shall prevail."

**6.**  11 U.S.C. §§ 1101–1146.

**7.**  APA § 1.01(a).

**8.**  APA § 1.01(d).

**9.**  APA § 3.01(c)(v).

of the agreement, though it certainly had constructive knowledge from the reference in Conoco's assignment to Alma of the leases Noble was purchasing.[10]

The APA does not list the Exchange Agreement among Noble's "Assumed Liabilities",[11] but section 8.03 states that Noble

assumes all duties and obligations as the owner of the Assets which accrue or arise from and after [closing], including without limitation the obligation [to] ... (iii) perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder, and (iv) to comply with any [consent decrees or laws], and to comply with any [laws] to the extent that any such obligation or liability is attributable to events or periods of time after [closing].[12]

Executory contracts are specially treated under Section 365 of the Bankruptcy Code.[13] As we discuss more fully below, the parties disagree over whether the Exchange Agreement is an executory contract and whether it was expressly assumed. In any event, Noble argues, section

8.03 refers only to post-closing obligations.[14] Except as provided by section 8.03, Noble did not "assum[e] any liability of [Alma] or related to the Assets of any kind or description whatsoever."[15]

The APA excused Noble from closing unless "[t]he Plan materially conforms to the terms and conditions of this Agreement, ... and the Plan and any modifications thereto have been consented to by [Noble] in writing".[16] The Plan authorizes "[a]ll transfers of assets anticipated or provided for under the [APA]".[17] The Plan contains several provisions regarding executory contracts but does not mention the Exchange Agreement. Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing.[18] Section 10.9 of the Plan states:

Exhibit "J" ... reflects certain agreements, some of which may or may not be binding contracts and may or may not be Executory Contracts, which shall be rejected by [Alma at closing]. By no later than July 28, [Noble] shall notify [Alma] of any ... executory contracts which are not set forth on Exhibit "J"

---

10. *See, e.g., Cooksey v. Sinder,* 682 S.W.2d 252, 253 (Tex. 1984) (per curiam) ("A purchaser is charged with knowledge of the provisions and contents of recorded instruments."); *Carr v. Oaktree Apartments,* 46 So.3d 793, 797 (La. Ct. App. 2010) ("Third persons are deemed to have constructive knowledge or notice of the existence and contents of recorded instruments affecting immovable property."); *McCurdy v. Bloom's Inc.,* 907 So.2d 896, 899 (La. Ct. App. 2005) (same); *Voelkel v. Harrison,* 572 So.2d 724, 726–727 (La. Ct. App. 1990) (same); *see also* Tex. Prop. Code § 13.002(1) ("An instrument that is properly recorded in the proper county is ... notice to all persons of the existence of the instrument...."); La. Civ. Code Ann. art. 3338 (2017) ("rights and obligations established or created" by certain written instruments "are without effect as to a third person unless the instrument is registered by recording it in the

appropriate mortgage or conveyance records").

11. APA § 1.04.

12. APA § 8.03(b).

13. 11 U.S.C. § 365.

14. Noble points out that under APA Section 8.04, Alma is responsible for asserted liabilities "arising from any injury or occurrence prior to [closing]". APA § 8.04(b)(ii).

15. APA § 1.06.

16. APA § 6.01(g).

17. Plan § 12.8.

18. Plan § 10.8.

and which [Noble] elects not to have assumed and assigned to it by [Alma]. All ... executory contracts which are not (i) rejected or the subject of a motion to reject as of the Confirmation Hearing, (ii) on Exhibit "J" or (iii) on the list provided by [Noble] to [Alma] ... pursuant to this section, shall be assumed by [Alma] and assigned to [Noble].[19]

Alma did not reject the Exchange Agreement in any way permitted by the Plan.

The bankruptcy court's Order, issued in 2000, "approved and confirmed in all respects" the Plan and the APA.[20] Paragraph 15 of the Order provides:

Except for those contracts and agreements that have either already been assumed or rejected, those Executory Contracts ... proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble].... Those Executory Contracts ... proposed to be rejected pursuant to the Plan ... are ordered rejected.... [Noble has] provided adequate assurance of future performance of all Executory Contracts ... being assumed and assigned to it.[21]

After the bankruptcy proceeding concluded, Noble acted as if it had assumed the Exchange Agreement. In 2008, it decommissioned an obsolete tank battery on the property it had received from Conoco under the agreement. In 2011, Noble agreed to indemnify and defend Conoco under the Exchange Agreement in two environmental contamination lawsuits, one filed in 2004 and the other in 2008. But in a third suit, filed in 2010, Noble refused to indemnify Conoco under · the Exchange Agreement.

Conoco sued Noble for breach of the Exchange Agreement to recover the $63 million it paid to settle the 2010 suit. Both sides moved for summary judgment. The trial court denied Conoco's motion, granted Noble's, and severed the summary judgment from other claims, making it appealable. The court of appeals reversed and rendered summary judgment for Conoco, holding that the Exchange Agreement was an executory contract that was assumed by Alma and assigned to Noble in the bankruptcy proceeding.[22] The court remanded the case to the trial court for further proceedings.[23]

We granted Noble's petition for review.[24]

## II

Because several of the provisions of the APA, Plan, and Order that we must interpret apply to executory contracts, we consider first whether the Exchange Agreement qualifies. Section 365 of the Bankruptcy Code authorizes a bankruptcy trustee to assume or reject executory contracts and prescribes how that authority is to be exercised.[25] Although the statute does not include a definition, the United States Supreme Court has stated that "Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.' " [26] The

19. Plan § 10.9.

20. Order ¶ 1.

21. Order ¶ 15.

22. 462 S.W.3d 255, 259, 275–276 (Tex. App.—Houston [14th Dist.] 2015).

23. *Id.*

24. 59 Tex. Sup. Ct. J. 1593 (Sept. 2, 2016).

25. 11 U.S.C. § 365.

26. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (citation omitted).

Fifth Circuit has phrased the test this way: "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[27] A debtor-in-bankruptcy's executory contracts present special issues in handling the estate. As the Third Circuit has explained:

> Executory contracts in bankruptcy are best recognized as a combination of assets and liabilities to the bankruptcy estate; the performance the nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the nonbankrupt is a liability. The debtor (or trustee that has stepped into the debtor's shoes) may elect to assume an executory contract, in which case § 365 mandates that the debtor accept the liability with the asset and fully perform his end of the bargain.[28]

The Exchange Agreement did two things: it provided for a swap of assets between Conoco and Alma, and it mutually obligated them to indemnify each other for all environmental contamination claims related to the properties received. The indemnity obligation covered all claims of contamination, regardless of when it occurred—whether before or after the agreement—and who was at fault—even if the indemnitee. The property transfers were completed immediately, but the mutual indemnity obligations survived. At the time Alma filed for bankruptcy protection, either party could summon the other to perform on its indemnity. Courts have uniformly held that contracts imposing ongoing indemnity obligations contingent on future events are executory.[29] Noble cites no case to the contrary, and we have found none.

■ Rather, Noble argues that the essence of the Exchange Agreement was the property swap, that the mutual indemnities were tangential, that the parties substantially performed the agreement when the property interests were assigned, and that the remaining indemnity obligations, contingent on future events, did not make the agreement executory. Noble cites two cases in support of its argument. One, *In re Interstate Bakeries Corp.*, involved the sale of a business and its assets along with a license agreement authorizing the buyer's perpetual, exclusive, and royalty-free use of the seller's trademark.[30] The court concluded that the "essence of the agreement" was the sale of the business, not merely the licensing of the seller's trademark, especially when it concerned only

27. *Phoenix Expl., Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62–63 & n.8 (5th Cir. 1994) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 458–462 (1973); Vern Countryman, *Executory Contracts in Bankruptcy: Part II*, 57 Minn. L. Rev. 479 (1974)).

28. *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 238 (3d Cir. 1995).

29. See *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't, Inc.)*, 950 F.2d 1492, 1496 (9th Cir. 1991); *Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985); *In re Abitibi-Bowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009); *In re Safety-Kleen Corp.*, 410 B.R. 164, 166–168 (Bankr. D. Del. 2009); *Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.) Inc.)*, 284 B.R. 541, 547–550 (Bankr. D. Del. 2002); *Waldschmidt v. Metro. Lincoln-Mercury, Inc. (In re Preston)*, 53 B.R. 589, 591 (Bankr. M.D. Tenn. 1985); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 117 (Bankr. S.D.N.Y. 1982).

30. *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 961 (8th Cir. 2014).

one of the assets sold.[31] Therefore, the court concluded, the license agreement was not executory.[32] The other case, *In re Exide Technologies*, similarly involved the sale of a business accompanied by a trademark license agreement obligating the seller to maintain quality standards and refrain from using the trademark.[33] The court concluded that the essence of the agreement was the sale of the business, not the trademark license, and therefore the license agreement was not executory.[34] As another court has observed, licensing agreements are "not ... universally considered executory contracts."[35] Rather, a court must "examine the unperformed duties and obligations of each party to determine the status of an agreement."[36] *Exide Technologies* and *Interstate Bakeries* concluded that the trademark licensing obligations were "minor" in the context of the entire agreement.[37]

[2, 3] The mutual indemnity obligations under the Exchange Agreement were in no sense minor or unrelated to the property swap. The indemnities were an important factor in the value of the properties transferred. With substantial performance, "the defects in performance do not prevent the parties from accomplishing the purpose of the contract."[38] The stated purpose of the Exchange Agreement was to transfer responsibility for the swapped parties as well as title. Any failure to perform the mutual indemnity obligations would deny the indemnitee the benefit of its bargain. When Alma filed for bankruptcy, the performance it owed Conoco under the Exchange Agreement was a liability, and the performance Conoco owed it was an asset. We agree with the court of appeals that the Exchange Agreement was an executory contract.

### III

■ As for whether Alma assumed the Exchange Agreement and assigned it to Noble, the APA is less than perfectly clear. Noble agreed to buy Alma's assets listed in Exhibit "A".[39] The property interests Alma had acquired from Conoco were in that list.[40] Noble also agreed to buy "[a]ll [Alma's] rights and interests in and to all ... agreements ... in any way associated with" the purchased assets, "including but not limited to, those Material Contracts ... described on Exhibit 'D' ".[41] Although the Exchange Agreement was not listed with such agreements in Exhibit "D" and does not fall within the general description of "Material Contracts", the interests Noble purchased were explicitly "not limited to" those listed in Exhibit "D" or described as "Material Contracts".[42] The Exchange Agreement was certainly associated with assets Noble bought. Conoco's assignment of leases to Alma was

31. *Id.*

32. *Id.*

33. 607 F.3d 957, 963 (3d Cir. 2010).

34. *Id.* at 964.

35. *Qintex Entm't, Inc.*, 950 F.2d at 1495.

36. *Id.*

37. *Exide*, 607 F.3d at 964; *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 964 (8th Cir. 2014) (obligations under the license were

relatively minor in the context of the agreement to sell operations and assets in certain territories).

38. *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1195 (5th Cir. 1981).

39. APA § 1.01(a).

40. APA Ex. A.

41. APA § 1.01(d).

42. APA § 1.01(d).

expressly subject to the Exchange Agreement and set out its indemnity provisions in detail. The Exchange Agreement was thus among the interests Noble purchased.

Alma's indemnity obligation under the Exchange Agreement was a liability, but the agreement was not included in the APA's list of Noble's "Assumed Liabilities".[43] Noble argues that it bought only the benefits of the Exchange Agreement and not the liabilities. Conoco responds that Section 365 of the Bankruptcy Code requires that executory contracts like the Exchange Agreement be purchased *cum onere*—with burdens as well as benefits. We need not resolve this dispute because Noble's argument is contrary to the APA.

Under Section 8.03 of the APA, Noble agreed to

> assume[ ] all duties and obligations as the owner of the Assets which accrue or arise from and after [closing], including without limitation the obligation [to] . . . (iii) perform obligations under any executory contracts or unexpired oil and gas leases expressly assumed hereunder, and (iv) to comply with any [consent decrees or laws], and to comply with any [laws] to the extent that any such obligation or liability is attributable to events or periods of time after [closing].[44]

Noble argues that its obligation to indemnify Conoco for the claims in the 2010 lawsuit accrued or arose when the obligation was created by the Exchange Agreement years before the bankruptcy proceeding. It cites a Third Circuit case, *In re Allegheny Health, Education and Research Foundation,* in which the purchaser of assets in bankruptcy—a number of hospitals—agreed to assume liability only for obligations arising after closing of the transaction.[45] The court held that hospital employees' accrued sick leave was a pre-closing obligation because "the collective bargaining agreements show[ed] that once the employees had accumulated sick leave, they had a right to the leave, albeit a right contingent on future illness, injury or retirement."[46] "A contingent obligation," the court wrote, "is, nonetheless, an obligation."[47] Likewise, Noble argues, the indemnity obligation under the Exchange Agreement, though contingent on a claim being made against Conoco, was nonetheless an obligation. But *Allegheny* held only that the obligation to pay employee benefits arose when employees had earned them, not when the collective bargaining agreements were executed. *Allegheny* does not support Noble's argument that a contingent obligation arises when it is created.

We have held that "a claim based on a contract that provides indemnification from liability does not accrue until the indemnitee's liability becomes fixed and certain."[48] Conoco's liability did not become fixed and certain until it settled the lawsuit in 2011 for $63 million. Noble also argues that the indemnity claim against Conoco in the 2010 suit was for contamination that occurred years before the Exchange Agreement was executed and thus not attributable to events following closing of the APA. But again, the indemnity obligation is attributable to the event that triggered it—the settlement of the 2010 suit, not the execution of the Exchange

---

43. APA § 1.04.

44. APA § 8.03(b).

45. 383 F.3d 169, 172 (3d Cir. 2004).

46. *Id.* at 178.

47. *Id.*

48. *Ingersoll-Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 205 (Tex. 1999).

Agreement. The obligation accrued, arose, and was attributable to events that occurred long after the closing of the APA. Thus, it was assumed by Noble under Section 8.03 of the APA.

The Plan and Order reinforce this interpretation of the APA. Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing.[49] Section 10.9 required Noble to notify Alma by a certain date of its election not to have specific executory contracts assumed and assigned to it. "All ... executory contracts ... not ... rejected ... pursuant to this section," Section 10.9 states, "shall be assumed by [Alma] and assigned to [Noble]."[50] The Exchange Agreement was not specifically referenced in the Plan and was never rejected in any way permitted by the Plan and thus was assumed by Alma and assigned to Noble. Paragraph 15 of the bankruptcy court's Order clearly stated: "those Executory Contracts ... proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble]".[51]

The APA did not require Noble to close unless "[t]he Plan materially conforms to the terms and conditions of this Agreement".[52] The fact that Noble elected to close indicates that in its view, at least, the assignment of executory contracts under

the Plan materially conformed to the APA. And Noble's post-bankruptcy conduct was consistent with that view. Noble removed an unused facility as required by the Exchange Agreement, and even indemnified Conoco from liability on two other contamination claims.[53]

Noble argues that the Exchange Agreement could not be assumed and assigned under the general, catchall assumed-unless-rejected provisions of Sections 10.8 and 10.9 of the Plan and Paragraph 15 of the Order, citing the Fifth Circuit's opinion in *In re O'Connor*.[54] O'Connor, the debtor in a Chapter 11 proceeding, was a party to a partnership agreement that the bankruptcy court held, and the district court assumed, was an executory contract.[55] The reorganization plan provided that certain executory contracts—not the partnership agreement—"are hereby rejected" while all others not previously rejected—which could have included the agreement—"will be assumed."[56] Neither the debtor's disclosures nor the plan made any specific reference to the agreement.[57] After the plan was confirmed, the estate trustee claimed to be entitled to exercise the debtor's rights under the partnership agreement.[58] The court of appeals held that the partnership agreement was not assumable under Section 365(c)(1) of the Bankruptcy Code and Louisiana law, and therefore the agreement passed through the bankruptcy unaffected to the pre-bankruptcy debtor

---

49. Plan § 10.8.

50. Plan § 10.9.

51. Order ¶ 15.

52. APA § 6.01(g).

53. The dissent misses the point, which is not that Noble's acceptance of responsibility under the Exchange Act created indemnity obligations that did not exist, but that Noble initially interpreted the APA, Plan, and Order as Conoco does.

54. *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001).

55. *Id.* at 396, 400.

56. *Id.* at 395, 401.

57. *Id.* at 401.

58. *Id.* at 396.

rather than to the reorganized debtor, a liquidating trust.[59] The bankruptcy court had not addressed that issue but had concluded that the partnership agreement had neither been assumed nor rejected because "will be assumed", especially in contrast with "are hereby rejected", indicated that something more than plan confirmation was required for assumption.[60] The court of appeals deferred to the bankruptcy court's interpretations of the plan, noting that it was "consistent with the conclusions by other courts that an executory contract may *not* be assumed either by implication or through the use of boilerplate plan language." [61]

Thus, the actual holdings in *O'Connor* were that the partnership agreement was not an assumable executory contract and that the bankruptcy court's interpretation of the plan's literal language was entitled to deference. The Fifth Circuit's labeling of the language at issue as "boilerplate" was no more than an aside. The court in *In re Greater Southeast Community Hospital Corp. I* characterized it as "dicta upon an alternative ground" for the court's decision.[62] The Chapter 11 plan in *Greater Southeast* provided that executory contracts not identified within a specified time "will be deemed assumed", subject to provisions relating to cure.[63] Distinguishing *O'Connor*, the court gave effect to the provision:

The plan here expressly assumed the executory contracts at issue, and did not assume them by implication. Moreover, [there is no contention] that the plan used ineffectual boilerplate language. By explicitly deeming the executory contracts at issue assumed (subject to a retained right of rejection if cure amounts proved unacceptable) and setting forth provisions for fixing the cure amounts, and deadlines for paying the same, the confirmed plan here can hardly be said to have employed "boilerplate language" (whatever that term means).[64]

*Greater Southeast* also distinguished *In re Parkwood Realty Corp.*[65] There, after the debtor in a Chapter 11 proceeding had rejected several executory contracts, the plan provided that "[a]ll other executory contracts ... which have not been previously rejected shall be deemed rejected on [the plan's effective date]." [66] The debtor did not disclose or mention a shareholders agreement to which it was a party, or give its co-party, Parkside Lakes, notice of the bankruptcy proceeding.[67] Repeatedly referring to the plan language as boilerplate, the bankruptcy court refused to allow the debtor to avoid its obligations under the agreement for two reasons.[68] First: "rejection [of an executory contract] is specifically subject to § 365 and as such requires 'actual consideration by the Court.' ... [T]o approve the rejection of an unidentified contract results in purely fictitious compliance with the Code." [69]

59. *Id.* at 401–402.

60. *Id.* at 401.

61. *Id.*

62. *Alberts v. Humana Health Plan, Inc. (In re Greater Southeast Cmty. Hosp. Corp. I)*, 327 B.R. 26, 34 (Bankr. D.D.C. 2005).

63. *Id.* at 29 n.3.

64. *Id.* at 35.

65. 157 B.R. 687 (Bankr. W.D. Wash. 1993).

66. *Id.* at 689.

67. *Id.* at 689, 691.

68. *Id.* at 690–691.

69. *Id.* at 691 (internal citation omitted). The dissent argues that the court in Alma's bankruptcy proceeding could not have given actual consideration to approval of Alma's assumption and assignment of the Exchange Agree-

Second, and perhaps more important, are the due process implications inherent in the debtor's position. Parkside Lakes has never had notice that the debtor viewed the Shareholders Agreement as an executory contract, much less that it was one of those being rejected. Further, Parkside Lakes did not have notice of the hearing on confirmation. Indeed the executory contract argument was only raised defensively, after confirmation, when it was too late to file a claim for damages. This is insufficient.[70]

According to the court in *Greater Southeast,* "*Parkwood Realty* turned on due process concerns, and only secondarily questioned the effectiveness of a plan provision deeming executory contracts rejected."[71] Those concerns were for the debtor's co-party who, unlike Noble, had no notice of the proceedings; Noble, in contrast, was thoroughly involved in Alma's bankruptcy.

Two cases help summarize the law on assumption-rejection catchall provisions in Chapter 11 plans. The plan in *In re Amer-*

*ivision Communications, Inc.* provided that "the Debtor shall be deemed to have rejected each Executory Contract to which it is a party, unless such contract ... was previously assumed by the Debtor" or other specified conditions were met, and "[t]he Confirmation Order will provide for the rejection of those Executory Contracts not assumed or assigned previously or as provided herein."[72] The debtor listed a production contract as one of its executory contracts, and the co-party, Dataprose, knew of the bankruptcy proceeding, but the production contract was not listed as one to be rejected.[73] After the plan was confirmed, Dataprose objected to the rejection of the production contract.[74] The court upheld the language of the plan and confirmation order:

> In the case of *In re Victory Markets, Inc.,* 221 B.R. 298 (2d Cir. BAP 1998), the Chapter 11 reorganization plan contained a provision that explicitly rejected all executory contracts not listed on an assumption schedule attached to the

---

ment when it did not know the agreement existed. *Post* at 790. But Section 365 does not impose an obligation on the court to conduct an independent investigation. Conoco was a party to the proceeding and raised no objection. And Noble had at least constructive notice of the Executive Agreement in its chain of title and raised no objection. There is nothing before us to indicate that Alma's assumption and assignment to Noble were of any interest to creditors or others. The bankruptcy court's approval of the plan was perfectly understandable.

**70.** *Id.*

**71.** *Greater Southeast,* 327 B.R. at 35. Thus, neither *O'Connor* nor *Parkwood* supports the dissent's broad assertion that "bankruptcy courts have consistently concluded that the assumption or rejection of an executory contract under section 365 cannot be approved in bankruptcy if the contract has not been disclosed." *Post* at 790. The only other case it

cites in support is *In re Golden Triangle Film Labs, Inc.,* 176 B.R. 608, 610 (Bankr. M.D. Fla. 1994). There, as the dissent notes, the plan provided that "all executory contracts and unexpired leases of the Debtor shall be assumed ... and ... assigned to [the] reorganized [debtor] ... except any executory contracts and unexpired leases that are subject of separate motions to reject file[d] pursuant to [Section] 365". *Id.* at 609. The court held that because no motion to reject the nonresidential lease at issue had been filed, and the plan and Section 365(d)(4) both required such a motion, the lease had not been rejected. *Id. Golden Triangle* is contrary to the dissent's view that the plain language of a bankruptcy plan and order, though general, cannot control.

**72.** *Dataprose, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision Commc'ns, Inc.),* 349 B.R. 718, 721 (10th Cir. BAP 2006).

**73.** *Id.*

**74.** *Id.* at 721–722.

plan. A majority of the court ruled that the absence of an executory contract from the schedule effected a rejection of the contract at issue because the plan language was clear and the contract was not explicitly assumed. *Id.* at 304–05.

We agree with the Court of Appeals for the Fifth Circuit that specific notice of the plan proponent's intent is required through the confirmation process or by separate motion. [*In re Nat'l Gypsum Co.*, 208 F.3d 498, 513 (5th Cir. 2000).] However, the question in this case is not only whether the use of boilerplate language is acceptable (assuming this is boilerplate language), but also whether the notice under the circumstances was adequate.

Under the facts of this case, the Court concludes that the plan language provided adequate notice of the intended rejection. The Court does not invalidate boilerplate language per se. The validity of any language depends upon notice and clarity and the overall information provided to the parties in interest. Here, the plan provision put any party to an executory contract on notice that absent specific assumption, the contract was rejected.[75]

The second case, *Tenucp Property, LLC v. Riley (In re GCP CT School Acquisition, LLC)*,[76] involved a Chapter 11 debtor tenant's rejection of a lease. The court upheld the rejection:

Another issue that has surfaced in case law is when a party uses so-called boilerplate language to assume or reject.

Some courts have held that "boilerplate" language in a chapter 11 plan may provide adequate notice of the proposed rejection of an executory contract. *See, e.g., Dataprose, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision Commc'ns, Inc.)*, 349 B.R. 718 (10th Cir. BAP 2006). . . .

The U.S. Bankruptcy Appellate Panel of the Second Circuit reached a similar conclusion in *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.)*, 221 B.R. 298 (2d Cir. BAP 1998). . . .

Other courts, however, have concluded that general boiler plate language does not automatically effect assumption or rejection, holding that the assumption or rejection will only be effective if the bankruptcy court actually considers the provision at issue.[77] . . .

Ultimately, the issue is one of notice. As the *Amerivision* panel noted, the question is not only whether the language contained within the plan or motion is sufficiently explicit, but whether the notice (service of the relevant documents) under the circumstances was adequate. Thus, "the validity of any language depends upon notice and clarity and the overall information provided to the parties in interest."[78]

We would be reluctant to disregard any language in a court order as "boilerplate", but that label certainly does not fit here. The Order confirmed the APA and the Plan that used both exclusive and non-exclusive language throughout, and we

---

75. *Id.* at 723.

76. 429 B.R. 817 (1st Cir. BAP 2010).

77. *Id.* at 827–828 & n.14 (citing *In re Cole*, 189 B.R. 40, 46 (Bankr. S.D.N.Y. 1995) (refusing to give effect to boilerplate assumption provision in plan); *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001);

*In re Parkwood Realty Corp.*, 157 B.R. 687, 690–691 (Bankr. W.D. Wash. 1993); *Cont'l Country Club, Inc. v. Burr (In re Cont'l Country Club, Inc.)*, 114 B.R. 763, 766–767 (Bankr. M.D. Fla. 1990)).

78. 429 B.R. at 827–829 (quoting *Amerivision*, 349 B.R. at 723).

must assume the choices were intentional. As Conoco observes, the Plan could have stated, as reorganization plans often do, that all executory contracts not formally assumed and assigned by a certain date would be rejected. Either way, the language is adjudicatory, not boilerplate.[79]

Noble complains that the Exchange Agreement was not listed in Alma's disclosures or mentioned in any way in the bankruptcy proceeding and asserts that it was unaware of the agreement before closing on the APA.[80] We have noted that the Exchange Agreement was specifically referenced in Conoco's assignment to Alma of some of the interests Noble acquired, and that the assignment was expressly subject to the Exchange Agreement. Thus, Noble had at least constructive notice of the Exchange Agreement. Noble also complains that Conoco was a party to the bankruptcy proceeding and could have disclosed the Exchange Agreement but never did. Noble argues that full disclosure in bankruptcy proceedings is essential, and that if a buyer of a debtor's assets risks being saddled with undisclosed liabilities, asset sales, important in estate reorganizations, will be less attractive. While we take Noble's point, the issue before us is not whether the bankruptcy proceedings were conducted as they should have been. We decide what the APA, the Plan, and the Order mean, and whether they are effective under Section 365. As critical as disclosure in bankruptcy proceedings may be, we think it more critical that parties to bankruptcy proceedings and others have confidence that reorganization plans and court orders will be interpreted and enforced according to their plain terms.

The dissent argues that today's decision is "manifestly inequitable."[81] We disagree. Noble knew from the plain terms of the APA, the Plan, and the Order that it could be assigned executory contracts not specifically listed. It had at least constructive knowledge of the Exchange Agreement in its own chain of title. Years after the bankruptcy proceeding was over, it repeatedly honored the indemnity obligation imposed by the agreement. And had Noble needed indemnification from Conoco, no doubt it would have sought the benefits promised it by the Exchange Agreement.[82] But inequitable or not, we think the result we reach is compelled by the governing documents and the law.

We thus conclude that by the APA, the Plan, and the Order, the Exchange Agreement was assumed by Alma and assigned to Noble.

* * * * *

The judgment of the court of appeals is, accordingly,

*Affirmed.*

---

**79.** *See, e.g., Amerivision,* 349 B.R. at 721; *Charter Asset Corp. v. Victory Mkts., Inc. (In re Victory Mkts., Inc.),* 221 B.R. 298, 303 (2d Cir. BAP 1998) (holding that plain language, "unexpired leases ... not previously assumed and assigned are hereby specifically rejected", should be given effect).

**80.** The dissent cites three cases "that have addressed a bankruptcy debtor's failure to follow the specific requirements of section 365 when attempting to dispose of an executory contract": *American Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 78 (3d Cir. 1999); *In re Allegheny Health,*

*Education and Research Foundation,* 383 F.3d 169, 172 (3d Cir. 2004); and *Gray v. Western Environmental Services & Testing, Inc. (In re Dehon, Inc.),* 352 B.R. 546, 558 (Bankr. D. Mass. 2006). *Post* at 791. In all three, the court gave effect to the debtor's intent. Thus, the dissent's reliance on these cases is perplexing.

**81.** *Post* at 786.

**82.** After Alma's bankruptcy, Noble's predecessor sold the assets obtained under the Exchange Agreement.

Justice Johnson filed a dissenting opinion, in which Justice Green and Justice Guzman joined.

Justice Lehrmann did not participate in the decision.

Justice Johnson, joined by Justice Green and Justice Guzman, dissenting.

I disagree with the Court for essentially two reasons. First, the Court says that "the issue before us is not whether the bankruptcy proceedings were conducted as they should have been." *Ante* at 783. But that is precisely the issue. Alma was not authorized to assign the Exchange Agreement, which I agree was an executory contract, unless it was done pursuant to and in conformance with Bankruptcy Code section 365. 11 U.S.C. § 365.[1] Even Conoco agrees:

> Alma could not have assigned *any* executory contract—the Exchange Agreement or anything else—in its bankruptcy to [Noble] under Texas law; it could only accomplish such assignment under [Bankruptcy Code] Section 365. "[S]ection 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy." *Compton v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC)*, 495 B.R. 303, 319 (Bankr. S.D. Tex. 2013); *see In re Qintex Entm't, Inc.*, 950 F.2d 1492,

1495–96 (9th Cir. 1991); *In re Taylor*, 198 B.R. 142, 167 (Bankr. D. S.C. 1996); *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 638 (Bankr. N.D. Miss. 1985); *In re LHD Realty Corp.*, 20 B.R. 717, 719 (Bankr. S.D. Ind. 1982) (all holding that, within the Bankruptcy Code, Section 365 exclusively governs the assumption and assignment of executory contracts in bankruptcy proceedings).

Conoco Resp. Brief at 13 (citing 11 U.S.C. § 365). The Court says Alma did so, but it did not.

Second, the Exchange Agreement was not disclosed in the bankruptcy proceeding by Alma, either in its schedules or otherwise. The Court avoids that difficulty by saying Noble had constructive knowledge of the Agreement and Alma assumed it because of general language in the Asset Purchase Agreement (APA), the Bankruptcy Plan, and the bankruptcy court's Order:

> Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing.... "All ... executory contracts ... not ... rejected ... pursuant to this section," Section 10.9 states, shall be assumed by [Alma] and assigned to [Noble]. The Exchange Agreement was not

---

1. *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't)*, 950 F.2d 1492, 1495 (9th Cir. 1991) (holding that the sale of the debtor's assets did not include any executory contract unless the debtor first assumed that contract under section 365); *Chira v. Saal (In re Chira)*, 367 B.R. 888, 900 (S.D. Fla. 2007) (recognizing that section 365 is the exclusive remedy for the sale of executory contracts); *Tech Pharmacy Servs., Inc. v. RPD Holdings, LLC (In re Provider Meds, LLC)*, No. 13-30678, 2017 WL 213814, at *16 (Bankr. N.D. Tex. Jan. 18, 2017) (noting that section 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy); *Compton v. Mustang*

*Eng'g Ltd. (In re MPF Holding U.S., LLC)*, 495 B.R. 303, 321 (Bankr. S.D. Tex. 2013) (recognizing that in the context of executory contracts, section 365 is the exclusive remedy available to parties wishing to sell property); *In re Taylor*, 198 B.R. 142, 167 (Bankr. D.S.C. 1996) (providing that section 365 is either an exclusive remedy or a necessary intermediate step before a sale of assets under section 363 is available); *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 638 (Bankr. N.D. Miss. 1985) (holding that within the context of executory contracts under a Chapter 11 plan, section 365 is the exclusive remedy available to debtors).

specifically referenced in the Plan and was never rejected in any way permitted by the Plan and thus was assumed by Alma and assigned to Noble. Paragraph 15 of the bankruptcy court's Order clearly stated: "those Executory Contracts ... proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble].... The fact that Noble elected to close indicates that in its view, at least, the assignment of executory contracts under the Plan materially conformed to the APA.

*Ante* at 779 (alterations in original) (citations omitted). Again, the Court is mistaken.

The Court recognizes what is well established in bankruptcy law: section 365 does not authorize a debtor to assign an executory contract unless it first assumes the agreement and the assignee gives adequate assurance of performance. *See* 11 U.S.C. § 365(f)(2). Under relevant bankruptcy authority construing section 365, general plan language such as that the Court references does not effect assumption of an undisclosed executory contract, approval of a putative assignee's adequate assurance of performance of it, and then its assignment.

The Court also points out that Noble acted as though it had assumed the Exchange Agreement by indemnifying Conoco in connection with previous post-bankruptcy claims. But past conduct "does not create a contract right that does not otherwise exist." *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 734 (Tex. 1981). And regardless of the circumstances surrounding any such actions by Noble and how it initially interpreted the bankruptcy documents, the actions do not alter whether Alma complied with the requirements of section 365 by expressly assuming the executory Exchange Agreement, Noble's

providing adequate assurance of its performance, Alma's expressly assigning it, and the bankruptcy court's approval of all three.

Further, without citing authority except Conoco's argument, the Court says that the Plan language could have gone the other way and solved Noble's problems. That is, the Plan could have said "as reorganization plans often do, that all executory contracts not formally assumed and assigned by a certain date would be rejected." *Ante* at 783. It may be true that Alma's Plan could have contained such language, but that is not the question. The question is what actually happened here and how it plays out under section 365.

Under section 365, a trustee or debtor-in-possession "may assume or reject any executory contract." 11 U.S.C. § 365(a); *Gray v. W. Envtl. Servs. & Testing, Inc. (In re Dehon, Inc.),* 352 B.R. 546, 558 (Bankr. D. Mass. 2006). "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.),* 360 F.3d 291, 296 (1st Cir. 2004) (quoting *Gannett v. Carp (In re Carp),* 340 F.3d 15, 25 (1st Cir. 2003)). The decision to reject or assume an executory contract is "subject to the court's approval," 11 U.S.C. § 365(a), thus protecting the integrity of the proceedings and the best interests of all the concerned parties.

Only after a debtor has assumed an executory contract can the debtor assign it. 11 U.S.C. § 365(f)(2); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238, 253 (5th Cir. 2006) ("According to § 365(f)(2)(A), assumption must precede assignment."); *In re Adelphia Commc'ns Corp.,* 359 B.R. 65, 71

(Bankr. S.D.N.Y. 2007) ("In order to assign an executory contract, a debtor in possession or trustee must assume it."). Bankruptcy courts have recognized that the Code does not preclude a debtor from neither assuming nor rejecting an executory contract. *In re Mirant Corp.*, 440 F.3d at 253 n.19. If an executory contract is neither assumed nor rejected, it remains in effect and passes with other property, that is, it "rides through" to the reorganized debtor. *Id.* Because such a contract is unaffected by the bankruptcy, the nondebtor party to the contract may seek redress outside of the bankruptcy context for any default by the debtor. *In re Dehon*, 352 B.R. at 561. Simply put, if the debtor wants to be relieved of the obligations of an executory contract, the contract must be disclosed and dealt with according to bankruptcy law and rules.

Conoco asserts, and the Court agrees that, pursuant to section 365, Alma assumed the entire Exchange Agreement and wholly assigned it to Noble. Noble advances two arguments in opposition. First, Alma did not disclose the Exchange Agreement during the bankruptcy proceedings as it was required to do by bankruptcy law. Second, an executory contract must be explicitly assumed in bankruptcy, and Alma did not explicitly assume the Exchange Agreement.

Regarding Alma's failure to disclose the Exchange Agreement during the bankruptcy proceedings, the Court concludes that "[a]s critical as disclosure in bankruptcy proceedings may be, we think it more critical that parties to bankruptcy proceedings and others have confidence that reorganization plans and court orders will be interpreted and enforced according to their plain terms." *Ante* at 783. Of course the Court is correct that parties to bankruptcy proceedings must have confidence in proceedings, plans, and court or-

ders. But that confidence only comes if the proceedings are transparent and bankruptcy law and requirements are strictly complied with. Otherwise, the proceedings become a matter of gamesmanship—how opaque can a debtor's filings and disclosures be and how many omissions can be made without consequences to the debtor seeking relief and other parties such as Conoco with knowledge of the opaqueness and who ostensibly are benefitted? In any event, the Court's statement is counter to the position of federal courts regarding full and complete disclosure, as is discussed below. *See, e.g., Zurich Am. Ins. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249, 252 (4th Cir. 2007) (holding that even though a Chapter 11 Plan of Liquidation had been confirmed, a creditor was not bound by the terms of the settlement because the debtor had not included the creditor on the schedule of creditors as required by 11 U.S.C. § 521).

Not only is the Court's decision counter to bankruptcy authority, it is manifestly inequitable. The Court's decision prejudices Noble, who was not notified by Alma of the indemnity obligation in the Exchange Agreement. And the Court's decision benefits the direct parties to the Exchange Agreement—Conoco and Alma—who negotiated, entered into, and accepted its risks in a presumably arms-length, fully-vetted business transaction, then allowed it to ride through the bankruptcy proceedings without notice to the trustee, the bankruptcy court, or the entities considering purchasing Alma's assets. Conoco benefits by having a claim against Noble instead of the reorganized Alma, and the reorganized Alma benefits by escaping liability for bankrupt Alma's failure to comply with bankruptcy law by not disclosing an executory contract. The Court says that "Noble knew from the plain terms of the APA, the Plan, and the Order that it could be assigned executory contracts not specif-

ically listed." *Ante* at 783. But as discussed below, Noble explicitly limited its assumption of Alma's liabilities in the APA and Noble should have been able to rely on Alma's bankruptcy schedules without the need to conduct its own investigation into whether those schedules were accurate. *See Popgrip, LLC v. Brown's Chicken & Pasta, Inc. (In re Brown's Chicken & Pasta, Inc.),* 503 B.R. 86, 94 (Bankr. N.D. Ill. 2013); *see also Cadle Co. v. Pratt (In re Pratt),* 411 F.3d 561, 566 (5th Cir. 2005).

As for Alma's failure to disclose the Exchange Agreement, a debtor is required to disclose assets, liabilities, and executory contracts on particularized schedules. 11 U.S.C. § 521(a)(1)(i); Fed. R. Bankr. P. 1007(b)(1)(C); *see* Official Bankruptcy Form 6, Schedule G ("Describe *all* executory contracts of *any* nature and all unexpired leases of real or personal property [and] [s]tate nature of debtor's interest in contract, i.e., 'Purchaser,' 'Agent,' etc." (emphasis added)). Alma did not disclose the Exchange Agreement as an executory contract. And bankruptcy courts have firmly put both the obligation of full disclosure and the risks of non-disclosure on the debtor. *See Diamond Z Trailer v. JZ L.L.C. (In re JZ L.L.C.),* 371 B.R. 412, 417 (9th Cir. BAP 2007) ("It is settled that the debtor has a duty to prepare these bankruptcy schedules and statements 'carefully, completely, and accurately' and bears the risk of nondisclosure." (quoting *Cusano v. Klein,* 264 F.3d 936, 946–49 (9th Cir. 2001))); *Burnes v. Pemco Aeroplex,* 291 F.3d 1282, 1286 (11th Cir. 2002) ("Bankruptcy courts also rely on the accuracy of the disclosure statements when considering whether to approve a no asset discharge. Accordingly, 'the importance of full and honest disclosure cannot be overstated.'" (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir. 1996))); *In re Colvin,* 288 B.R. 477, 481 (Bankr. E.D. Mich. 2003) (collecting cases and concluding that disclosure obligations of debtors "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge").

The Court seems to conclude that Alma's failure to disclose the Exchange Agreement as required by the Bankruptcy Code was excused because Noble had "constructive knowledge" of the agreement. *Ante* at 773–74. But "constructive knowledge" is not applicable in the bankruptcy context. Debtors are statutorily required to explicitly disclose assets, liabilities, and executory contracts so all the parties involved, including the bankruptcy court, can rely on the disclosures. *See Burnes,* 291 F.3d at 1286 (noting that creditors and bankruptcy courts rely on the accuracy of disclosure statements). "Schedules serve the important purpose of insuring that adequate information is available for the Trustee and creditors *without need for investigation* to determine whether the information provided is true." *In re Pratt,* 411 F.3d at 566 (emphasis added) (internal quotations omitted); *see also Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners),* 498 B.R. 679, 704 (Bankr. N.D. Tex. 2013) ("Under the Bankruptcy Rules, notice must be given in a bankruptcy case to counter-parties to the contract *and to other parties in interest* of a debtor-in-possession's contemplated decision to either reject or assume an executory contract." (emphasis added)). Further, "[p]arties who purchase assets from bankruptcy estates should be able to rely on debtors' Schedules and Statements of Financial Affairs. Otherwise, competent, financially able purchasers will shun a bankruptcy process that requires them to speculate about what they are asked to purchase." *In re*

*Brown's Chicken & Pasta*, 503 B.R. at 94 (determining that information in a letter and monthly operating report was not sufficient to put an asset purchaser on notice of the existence of a franchise agreement that was not included in the bankruptcy schedules).

Further, in concluding that Noble had constructive knowledge of the Exchange Agreement, the Court cites cases and statutes regarding notice based on recorded instruments. *Ante* at 774 n.10. But none of these are applicable in a bankruptcy proceeding where the requirements for assigning an executory contract are explicitly spelled out in the Bankruptcy Code. And finally, none of these address whether the purchaser of an oil and gas lease was put on notice of a *liability* not addressed in the purchase contract. *See Cooksey v. Sinder*, 682 S.W.2d 252, 253 (Tex. 1984) ("Because Cooksey's deed was properly recorded and within the chain of title of the Sinder parents and Tierra Buena, they had legal notice of the lien and thus took the property subject to that lien. This defeats their innocent purchaser defense."); *cf. Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) (holding that the assignee of a lease was not liable on a commission agreement in the lease because to be liable "it must have expressly assumed such liability").

Alma did not disclose the Exchange Agreement, and in the bankruptcy context, the risk of a bankruptcy debtor's failure to disclose falls on the debtor. *See, e.g., Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001) (holding that a debtor was judicially estopped from asserting a claim that had not been disclosed in bankruptcy because "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. . . . The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete." (quoting *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999))); *In re JZ L.L.C.*, 371 B.R. at 417 ("It is settled that the debtor . . . bears the risk of nondisclosure."); *Sanderson v. Ptasinski (In re Ptasinski)*, 290 B.R. 16, 26 (Bankr. W.D.N.Y. 2003) (denying debtors' discharge based on their failure to disclose assets and noting that "the benefits received by an honest debtor in a bankruptcy case, including a discharge of all dischargeable debts, a 'fresh start,' are extraordinarily disproportionate to the few demands and expectations [of full disclosure] placed upon a debtor by the Bankruptcy Code and Rules"). Otherwise, a debtor would be incentivized to conceal information. *Superior Crewboats Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 336 (5th Cir. 2004) ("The Hudspeaths had the requisite motivation to conceal the claim as they would certainly reap a windfall had they been able to recover on the undisclosed claim without having disclosed it to the creditors. Such a result would permit debtors to '[c]onceal their claims; get rid of [their] creditors on the cheap, and start over with a bundle of rights.'" (alterations in original) (quoting *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993))); *Burnes*, 291 F.3d at 1288 ("Allowing [the debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.").

Alma's failure to disclose the Exchange Agreement factors into the ultimate question of whether Alma assumed and assigned it in accordance with section 365's requirements. Under section 365, an executory contract may be assigned only after (1) it has been assumed by the debtor, (2) the assignee has provided adequate assurance of future performance, and (3) the bankruptcy court has approved. 11 U.S.C. § 365(a), (f)(2). Noble argues that Alma did not explicitly assume the Exchange Agreement and an executory contract must be explicitly assumed in bankruptcy—it cannot be assumed by implication. *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001) (stating that an executory contract may not be assumed by implication). This requirement of explicit assumption is closely tied to the requirement of court approval.

> Congress enacted section 365(a) as part of the Bankruptcy Code of 1978, making court approval of [executory contract rejection or assumption] obligatory for the first time.... The predecessor to section 365(a) ... did not explicitly require judicial approval [of assumption or rejection decisions].... In adopting a requirement of court approval, Congress overruled precedent that allowed trustees to show by informal conduct that they had either assumed or rejected [executory contracts].

*In re Dehon*, 352 B.R. at 560 (alterations in original) (quoting *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1026 (1st Cir. 1995)).

As noted above, the Court concludes that the Exchange Agreement was assumed in the bankruptcy proceeding based on bankruptcy plan language providing that "executory contracts not specifically referenced were to be 'assumed and assigned to [Noble]' unless rejected at clos-

ing." *Ante* at 779 (alteration in original) (citing Plan § 10.8). But the Court does not explain how the bankruptcy court could have approved the assumption as required by section 365 when the contract's existence was known only to Alma and Conoco and undisclosed by either of them in the bankruptcy to other parties, the trustee, or the court. Rather, the Court says that the bankruptcy court's approval of the plan was "perfectly understandable" even though it did not know the agreement existed because "Section 365 does not impose an obligation on the court to conduct an independent investigation." *Ante* at 781 n.69. I completely agree that section 365 does not require a court to conduct an independent investigation. But that point, again, goes back to Alma's responsibility to disclose the agreement because bankruptcy courts rely on disclosure statements. *See Burnes*, 291 F.3d at 1286 ("Bankruptcy courts also rely on the accuracy of the disclosure statements....").

Nor does the Court explain how the bankruptcy court could have intended its order specifying that Noble has "provided adequate assurance of future performance of all Executory Contracts and unexpired leases being assigned to it" to include the undisclosed Agreement when neither the court nor Noble knew of the contract. Order § 15. That is because there is no reasonable, legally sound explanation for it. Rather, as was noted by the court in *In re Parkwood Realty Corp.*, a bankruptcy court interpreting general language approving assumption of an undisclosed executory contract and finding in its order that adequate assurance of future performance has been provided when the contract was not disclosed and was unknown to the court, is pure fiction. 157 B.R. 687, 690–91 (Bankr. W.D. Wash. 1993).

Court approval of an executory contract's assumption has been described as

"an indispensable step in the process" and an "explicit rule[ ] laid out by Congress." *In re A.H. Robins Co.*, 68 B.R. 705, 710 (Bankr. E.D. Va. 1986) ("Judicial approval of a motion to assume is critical, as issues of cure of default, adequate assurance of future performance and compensation for pecuniary loss sustained as a result of default are matters of law left solely to the court's resolve."). Assumption of an executory contract "elevates a prepetition liability to a postpetition liability, but also entitles the nondebtor party to first priority status. Court approval thus provides protection to the unsecured creditors whose claims could be prejudiced by potentially burdensome contracts—ones that may have driven the business into bankruptcy in the first place." *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 45 (1st Cir. 2003).

As noted above, bankruptcy courts have consistently concluded that the assumption or rejection of an executory contract under section 365 cannot be approved in bankruptcy if the contract has not been disclosed. In *In re Parkwood Realty Corp.*, a bankruptcy plan provided that "[a]ll other executory contracts or unexpired leases of [the debtor] which have not been previously rejected shall be deemed rejected on the Effective Date." 157 B.R. at 689. The bankruptcy court concluded that an undisclosed executory contract was not rejected based on this language because section 365 requires "actual consideration by the court," and under section 365's requirements, "to approve the rejection of an unidentified contract results in purely fictitious compliance with the Code." *Id.* at 689–91.

Similarly, in *In re Golden Triangle Film Labs, Inc.*, a confirmed plan stated "all executory contracts and unexpired leases of the Debtor shall be assumed by (and, to the extent necessary, assigned to) reorganized Golden Triangle Film Labs, Inc. ... except any executory contracts and unexpired leases that are subject of separate motions to reject." 176 B.R. 608, 609 (Bankr. M.D. Fla. 1994). The court determined that the unexpired lease at issue was not assumed under this language because section 365 requires approval from the court and "[t]his Court is unwilling to accept the proposition that the entry of an Order of Confirmation of a Plan which contains such unspecific reference to unexpired leases and executory contracts would be sufficient to comply with the requirements of § 365(a) of the Code." *Id.* at 610.

The Fifth Circuit also recognized that interpreting the phrase "[a]ll ... executory contracts, other than contracts with or for the benefit of employees, agent[s] or brokers, *not* rejected prior to time [sic] set forth herein *will be assumed*" as providing for the assumption of an undisclosed contract "would be inconsistent with § 365(a), which requires court approval." *In re O'Connor*, 258 F.3d at 401 (alterations in original). The Court discounts the Fifth Circuit's labeling of the plan language in that case as "boilerplate" as "no more than an aside," and not the court's actual holding. *Ante* at 780. But regardless of whether the plan language is labeled "boilerplate," the ultimate issue is whether the proceedings complied with section 365's requirements, specifically that a bankruptcy court must approve both any assumptions and any rejections. And in bankruptcy proceedings, a general statement such as is contained in the bankruptcy court order here simply does not approve or disapprove of assumption of an undisclosed executory contract that the court has not expressly considered.

The Court references two cases in which plan language similar to the language in this case was upheld. *Ante* at 782 (quoting

*Dataprose, Inc. v. Amerivision Commc'ns (In re Amerivision Commc'ns, Inc.),* 349 B.R. 718 (10th Cir. BAP 2006); *Tenucp Prop. LLC v. Riley (In re GCP CT Sch. Acquisition, LLC),* 429 B.R. 817 (1st Cir. 2010)). But in both of those cases, as the Court's quotes reflect, the focus was on whether the parties in interest had adequate notice of the assumption or rejection of the executory contract. *In re GCP CT Sch. Acquisition,* 429 B.R. at 828–29 ("[T]he question is not only whether the language contained within the plan or motion is sufficiently explicit, but whether the notice (service of the relevant documents) under the circumstances was adequate. Thus, the validity of any language depends upon notice and clarity and the overall information provided to the *parties in interest.*" (emphasis added)); *In re Amerivision Commc'ns, Inc.,* 349 B.R. at 722 ("The Court does not invalidate boilerplate language per se. The validity of any language depends upon notice and clarity and the overall information provided to the *parties in interest.*" (emphasis added)). Here, as the asset purchaser, Noble was clearly a party in interest. But it was provided *no* information with regard to the Exchange Agreement. The validity of the Plan language as to the Executory Agreement depends upon the notice and information provided—or rather not provided— to Noble in the bankruptcy proceedings. Based on explicit section 365 requirements, I disagree that through the general Plan language Alma assumed the undisclosed Exchange Agreement, Noble gave adequate assurance of performance of it, and Alma assigned it to Noble.

Generally, if a debtor does not assume or reject an executory contract in bankruptcy, the contract "rides through" the bankruptcy and passes to the reorganized debtor, leaving the nondebtor's claim to survive the bankruptcy. *In re Mirant Corp.,* 440 F.3d at 253 n.19. The validity of

Noble's purchase of Alma's interest in the Johnson Bayou Field during Alma's bankruptcy is not being challenged. To determine what that purchase means for the separate contractual indemnity obligation, there are three applicable bankruptcy cases that have addressed a debtor's failure to follow the specific requirements of section 365 when attempting to dispose of an executory contract.

In *American Flint Glass Workers Union v. Anchor Resolution Corp.,* the debtor, Anchor, assumed and then "purported" to assign an executory contract under section 365 to an asset purchaser. 197 F.3d 76, 78 (3d Cir. 1999). Under the language of the asset purchase agreement, however, the buyer was to assume only some of the debtor's obligations under that contract. *Id.* at 81. The court concluded that this was not a true executory contract assignment because the debtor did not assign it *cum onere*—"[h]aving shifted fewer than all of the obligations (although it did assign all of the rights) created by the [executory contract], Anchor remains liable on those contractual obligations." *Id.* at 78, 81. In coming to this conclusion, the court looked at the underlying sales contract and noted that "here neither party to the sale transaction intended a true assignment of all rights and obligations. ... [The contract the] Purchaser was willing to (and did) accept was simply *not* the same [contract] that Anchor had originally negotiated, and had then assumed." *Id.* at 81. The court concluded that because Anchor had not assigned the contract, the claims against it for priority payments by the nondebtor party to the executory contract were fully preserved. *Id.* at 83.

In another case, the Third Circuit Court of Appeals addressed an executory contract in which Tenet Health System purchased collective bargaining agreements from the bankruptcy debtor, Allegheny.

*Tenet Healthsystem Phila., Inc. v. Nat'l Union of Hosp. & Health Care Emps. (In re Allegheny Health, Educ. & Research Found.)*, 383 F.3d 169, 172 (3d Cir. 2004). The agreements were listed on the schedule of "Assumed Contracts" that were to be assumed by Allegheny and assigned to Tenet. *Id.* However, the asset purchase agreement provided that Tenet only assumed obligations arising after the closing of the sale. *Id.* The nondebtor party to the collective bargaining agreement, the union, asserted that Tenet was refusing to abide by the terms of the collective bargaining agreements by failing to pay employees for sick leave that accrued before the bankruptcy sale. *Id.* at 173. The court concluded that under the asset purchase agreement Tenet was not liable for any liabilities arising before the sale. *Id.* at 178. The court determined that while Allegheny might be liable on the collective bargaining agreements, *American Flint Glass* "does not provide authority for holding Tenet liable for the parts of the collective bargaining agreements that it declined to assume." *Id.* at 177. The court also pointed out that "[t]o the extent that Tenet has been able to enjoy the benefits of the collective bargaining agreements without having to pay for the sick leave that accrued under them, [the union] has itself to blame" because it failed to object to the asset purchase agreement containing the "division of responsibility between Tenet and Allegheny." *Id.*

The Court states that *In re Allegheny* is contrary to Noble's position because the non-debtors in that case had an existing right that was due at the time of bankruptcy, while in this case, indemnity was not due until a covered liability was established. *Ante* at 778. But the Court fails to explain away the discussion in *In re Allegheny* of the plan language which assigned the agreement to Tenet and the contrary asset purchase agreement language in which Tenet did not assume all obligations in the agreement.

Finally, in *In re Dehon*, the court addressed executory contracts that were listed as assets to be transferred, but not as executory contracts to be assumed and assigned. 352 B.R. at 562. The asset purchase agreement included all the debtor's "right, title, and interest in and to all agreements." *Id.* at 552. The purchaser of the assets and the non-debtor parties to the executory contracts continued to perform under the contracts after the bankruptcy. *Id.* at 553. When the bankruptcy plan administrator sought to recover preferential payments made to the non-debtor parties, those parties argued that the contracts had been assumed by the debtor under section 365. *Id.* at 555. The court disagreed, noting that neither the debtor nor the plan administrator had requested assumption of the contracts, no assumption was approved by the court, and nothing indicated the debtor intended to assume the contracts. *Id.* at 564, 567. The court also concluded that because of the specific requirements in section 365, the sale order of the contracts did not operate as an assumption. *Id.* at 562. The court declined to decide whether the contracts "rode through" the bankruptcy, concluding that because the contracts had not been assumed, the non-debtor parties to them were subject to preference avoidance provisions. *Id.* at 566.

While none of these cases precisely fit the factual situation here, they are instructive for determining what happens in a situation such as this when the purchaser of an asset related to an executory contract has realized the benefits of the asset it purchased, but the related executory contract was not explicitly assumed and assigned by the debtor as required by section 365. In none of the cases did the courts try to manipulate the transactions

in order to force the debtor and the executory contract into compliance with section 365. Rather, the courts looked at what actually occurred in the bankruptcy proceedings and what rights and liabilities the parties intended to transfer.

Looking at what the parties intended here, we begin with the APA. In Article I, Noble agreed to purchase assets, including oil and gas leases, as described in Exhibit A. Section 1.04 is entitled "Assumed Liabilities" and provides that "[i]n consideration for the sale of the Assets, Buyer shall be responsible for the liabilities described in this Section." Neither the Exchange Agreement nor the indemnity obligation is included in that section as a liability. Section 1.06—"Liabilities"—provides that "[e]xcept for the Assumed Liabilities and Assumed Obligations (as such term is defined in Section 8.03 below), ... *Buyer is not assuming any liability of, or related to the Assets of any kind or description whatsoever.*" (Emphasis added).

Article III is entitled "Representations and Warranties." It states that Alma represented and warranted to Noble: "<u>Exhibit</u> <u>'D'</u> sets forth a list of the known contracts, agreements, plans, and commitments to which [Alma is] a party or ... bound," which meet the following criteria: "[a]ny guaranty, direct or indirect, by any affiliate of [Alma] of any contract, lease or agreement entered into by [Alma];" and "[a]ny agreement of surety, guarantee or indemnification by [Alma] or any of [its] affiliates outside of the ordinary course of business." The exchange Agreement was not listed on Exhibit D.

Article VIII contains obligations after closing. Section 8.03 sets out Noble's post-closing obligations including to assume "all duties and obligations as the owner of the Assets which accrue or arise from and after the Closing Date, including ... [to] perform obligations under any executory contracts or unexpired oil and gas leases *expressly assumed hereunder.*" (emphasis added). Section 8.04 sets out Alma's post-closing obligations including "Except for those matters expressly assumed by [Noble] ... [Alma] shall be responsible for and discharge all claims, costs, expenses and liabilities with respect to the Assets which accrue or relate to the times prior to" the effective date of closing.

Nothing in the APA indicates that Noble expressly assumed the Exchange Agreement or the indemnity obligation in it. Conoco points to the language in the confirmation order specifying that Alma was assuming and assigning to Noble all executory contracts not previously assumed or rejected. But as noted in the cases referenced above, when an executory contract is not assumed and assigned according to the section 365 requirements, as the Exchange Agreement was not, courts have looked to whether the parties intended for the debtor to assume the contract. And here, under the clear language of the APA, Noble intended to limit its assumption of any liabilities to obligations under executory contracts that were "expressly assumed" under the APA. Neither party argues that the Exchange Agreement was expressly assumed under the APA by Noble. To respond to what the Court says about the Plan language not rejecting all agreements not assumed when it could have done so, Noble did not want to assume any liabilities it did not know of— and said so in the APA.

Further, because Alma did not disclose the Exchange Agreement as required by bankruptcy law, as the debtor it bore the risk of nondisclosure. *See In re JZ L.L.C.,* 371 B.R. at 417. The risk of nondisclosure rightly should be that Alma, not the asset purchaser and its successors in interest, would remain liable for the parts of the Exchange Agreement that Alma did not

disclose and assign within the framework of the bankruptcy proceeding. *See In re Allegheny Health,* 383 F.3d at 177.

Conoco was a party to multiple other executory contracts with Alma that were listed as such in Alma's bankruptcy disclosure statement, along with a note about whether they were to be assumed or rejected and the identities of the parties to the contracts. So, Conoco was in a position to object to Alma's failure to include the Exchange Agreement in its disclosures and request that the bankruptcy court require Alma to either assume and assign the Agreement or reject it. Conoco did not do so. *See id.* (noting that the nondebtor party to an executory contract had itself to blame for not objecting to the asset purchase agreement). Under the circumstances, Conoco would not be deprived of its contractual indemnity right if the Court were to follow applicable bankruptcy precedent and hold that the Exchange Agreement rode through the bankruptcy and remained a liability of reorganized Alma. The right simply would not attach to Noble; it would attach to the reorganized party that succeeded to the interests of the party with whom Conoco made its deal in the beginning—Alma.

I would reverse the judgment of the court of appeals. Because the Court does not, I respectfully dissent.